BRYAN SCHRODER
United States Attorney
RETTA-RAE RANDALL
Assistant U.S. Attorney

LORI A. HENDRICKSON
TIMOTHY M. RUSSO
Trial Attorneys, U.S. Department of Justice, Tax Division

Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: RettaRae.Randall@usdoj.gov
Email: Lori.A.Hendrickson@usdoj.gov
Email: Timothy.M.Russo@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:16-cr-00121-TMB-DMS |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S OPPOSITION** |
| vs. | ) | **TO DEFENDANT'S MOTION TO** |
| | ) | **DISMISS INDICTMENT** |
| | ) | |
| LAWRENCE J. LAWSON, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

        COMES NOW the United States of America, by and through undersigned counsel,

and hereby files its opposition to defendant Lawrence J. Lawson, Jr.'s Motion to Dismiss

Indictment. Doc. 254.

## BACKGROUND

1. <u>Timeline of relevant events</u>

Based on the declarations submitted by the government in support of this memorandum in opposition to Lawson's Motion to Dismiss Indictment, the government expects the following facts, among others, to be established at the evidentiary hearing scheduled for August 6-8, 2018. This recitation of the facts is not intended to be exhaustive.

On October 19, 2010, Lawson filed his 2009 Individual Income Tax Return, Form 1040, reporting unpaid individual income taxes of $1,765,565. Hendrickson Dec. at ¶2. On March 5, 2011, the IRS assigned a collection case involving a taxpayer with the partial last name "LAWS" to an IRS Collections group in Anchorage, Alaska supervised by Revenue Officer Group Manager ("ROGM") John Williamson. Williamson Dec. at ¶¶3-4; *see also* Hendrickson Dec. at ¶3. On March 8, 2011, the Internal Revenue Service advised Lawson by letter that it was going to begin collection proceedings regarding his unpaid 2009 individual income taxes. Hendrickson Dec. at ¶4.

Williamson had been in a relationship with a woman named Tonya Barber from around late 2009 until September 2010.[1] Williamson Dec. at ¶3. According to Williamson, while dating Barber, she disclosed to him that she previously dated Lawson. *Id*. Williamson suspected that taxpayer "LAWS" could have been Lawson, so he asked fellow supervisor ROGM Douglas Hartford to confirm his suspicion. *Id*. at ¶4. When Hartford did so, Williamson immediately contacted his supervisor Chris Harris to report the conflict. *Id*.

---

[1] Williamson knew her as Tonya Faller-Naquin, a name from her prior marriage. To avoid confusion, the government will refer to her by her current, married name "Barber."

Harris agreed that Williamson had a conflict and assigned Hartford to supervise Revenue Officer "RO" Amber Kimmel on Lawson's collections case.[2] *Id.*; *see also* Harris Dec. at ¶2. Williamson took that conflict of interest seriously. Williamson Dec. at ¶12. Williamson took no action in Lawson's collection proceedings. *Id.* at ¶5; Hartford Dec. at ¶4.

Meanwhile, in mid-April 2011, Williamson and Barber rekindled their relationship. Williamson Dec. at ¶6. Barber moved into Williamson's house in May 2011 and lived there until late November 2011, when the two broke up again. *Id.*

During RO Kimmel's collections activity, she obtained copies of tax returns for businesses owned by Lawson as well as his individual income tax returns for 2009 and 2010. Based on her review of those tax returns, RO Kimmel wanted to refer Lawson directly for criminal investigation by IRS-Criminal Investigation ("IRS-CI"). *See* Hartford Dec. at ¶3. However, Hartford advised RO Kimmel that Lawson should be referred to IRS Civil Examination instead. *Id.*

On September 6, 2011, Hartford and RO Kimmel referred Lawson to IRS Civil Examination. Hendrickson Dec. at ¶5; *see also* Hartford Dec. at ¶3. Williamson had no involvement in the decision to refer Lawson's case to IRS Civil Examination. Williamson Dec. at ¶5; Hartford Dec. at ¶4.

On October 24, 2011, Lawson filed his 2010 Individual Income Tax Return, Form 1040, reporting unpaid individual income taxes of $2,020,384. Hendrickson Dec. at ¶6. On January 26, 2012, the IRS advised Lawson by letter that IRS Civil Examination was going

---

[2] At that time, RO Kimmel was known to IRS employees by the name "Martinez" or by her pseudonym "Grey." She is no longer an IRS employee. To avoid confusion, the government will refer to her by her current, married name "Kimmel."

to begin an audit of the 2010 Form 1120S corporate income tax return that he filed for his business, Little Wing, Inc. *Id*. at ¶7.

Following the breakup of Williamson and Barber in November 2011, Barber moved into an apartment located inside of an airplane hangar owned by Lawson. Williamson Dec. at ¶6. According to Williamson, between late-November 2011 and early April 2012, he continued to communicate with Barber and to see her on a regular basis. *Id*. According to Williamson, during this period, Barber invited him to her apartment inside of the hangar on numerous occasions and he spent several nights there. *Id*. at ¶¶6-7. In fact, Barber gave Williamson the pin code to the hangar and a set of keys to the hangar and her apartment. *Id*. at ¶6.

In December 2011 and January 2012, Barber had given Williamson permission to enter the hangar when she was not home on several occasions. *Id*. at ¶7.

In January 2012, IRS Civil Examination assigned the examination of one of Lawson's entities, Little Wing, Inc., to a revenue agent who subsequently left the Anchorage office. Oen Dec. at ¶2. Accordingly, minimal work was done on the examination between January and May 2012. *Id*.

On February 27, 2012, Williamson entered the hangar using the pin code to deliver some of Barber's personal belongings, which he left on the stairs leading up to her apartment. Williamson Dec. at ¶7. On April 4, 2012, Williamson drove his government vehicle with passenger RO Kimmel to make several field calls on collection cases unrelated

to Lawson.[3] Williamson Dec. at ¶9. Williamson also made several personal stops on that day, including to Barber's apartment in Lawson's hangar. *Id.* According to Williamson, he used the pin code to enter the hangar and then entered Barber's apartment through the front doors, which were propped open. *Id.* at ¶10. Williamson knew that Barber would not be home and that he was supposed to be working on other IRS collections cases with RO Kimmel. He looked around the apartment, but he did not take anything. *Id.* at ¶9.

On April 8, 2012, Williamson entered the hangar a final time, because Barber previously stated that she would miss receiving an Easter basket from Williamson. *Id.* at ¶11. Williamson delivered an Easter basket to her on that day and Barber thanked him for doing so shortly thereafter. *Id.*

In June 2012, IRS Civil Examination GM Sonia Oen reassigned the examination of Little Wing, Inc. to Revenue Agent ("RA") Michael Zeznock. Oen. Dec. at ¶3; Zeznock Dec. at ¶2. Because the tax returns of Lawson and his related entities contained several initial badges of fraud, the IRS assigned Fraud Technical Advisor ("FTA") Kalanges to assist RA Zeznock by recommending steps for further fraud development.[4] Oen Dec. at ¶4; Zeznock Dec. at ¶2; Kalanges Dec. at ¶2. On July 12, 2012, RA Zeznock expanded his civil examination to include Lawson's 2009 and 2010 personal tax returns, and in August

---

[3] On June 4, 2018, the government provided the Court with a report related to these events written by the U.S. Treasury Inspector General for Tax Administration ("TIGTA") for *in camera* review. The Court subsequently ordered the government to provide redacted copies of that report to Lawson. The government produced those records to Lawson on July 12, 2018.

[4] Kalanges was known to IRS employees by the IRS-approved pseudonym "Kelly." To avoid confusion, the government will refer to him by his actual name "Kalanges."

2012, he expanded the civil examination to include the tax returns for Lawson's medical practice Midnight Sun Oncology, Inc. Oen Dec. at ¶3; Zeznock Dec. at ¶3.

After working in close consultation with FTA Kalanges, GM Oen and RA Zeznock decided to refer Lawson to IRS-CI for criminal investigation. Oen Dec. at ¶4; Zecnock Dec. at ¶¶2-3; Kalanges Dec. at ¶3. They made that referral in February 2013. *Id.* Williamson played no role in the civil examinations, including the decision to refer Lawson to IRS-CI. Oen Dec. at ¶¶6-7; Zeznock Dec. at ¶¶4-5; Kalanges Dec. at ¶4.

From February to March 2013, IRS-CI evaluated the facts, accepted the referral and assigned the criminal investigation to Special Agent ("SA") Tonya Rhame. Rhame Dec. at ¶¶3-4. SA Rhame conducted an independent administrative criminal investigation. In July 2013, a grand jury investigation was initiated to investigate Lawson's potential tax fraud. Hendrickson Dec. at ¶8. The grand jury investigation was supervised by the Anchorage office of the U.S. Attorney. *Id.* SA Rhame never communicated with Williamson while she conducted her criminal investigation of Lawson. Rhame Dec. at ¶9. Accordingly, Williamson did not influence the criminal investigation in any way. *Id.* at ¶10.

Finally, in September 2015, IRS-CI referred Lawson's case to the U.S. Department of Justice, Tax Division, seeking authorization to prosecute him as required by 28 C.F.R. § 0.70. Hendrickson Dec. at ¶12. The Tax Division conducted an independent review of the evidence and authorized Lawson's prosecution in January 2016. *Id.* at ¶13.

2. <u>The government's initial beliefs regarding the Williamson incident</u>

Around late February 2013, SA Rhame learned that IRS collection proceedings began before the civil examinations of Lawson and his entities. *See* Rhame Dec. at ¶4. At

the start of the administrative criminal investigation of Lawson, SA Rhame met with RO Kimmel to discuss Lawson's collection proceedings to identify potential witnesses to interview and to gather documents. *Id.*

According to SA Rhame, during that meeting, RO Kimmel mentioned that her supervisor, Williamson, had inappropriately entered the apartment of his ex-girlfriend, Barber, which was located inside a hangar owned by Lawson. *Id.* at ¶5. RO Kimmel also mentioned that she reported the incident to TIGTA. *Id.* RO Kimmel further explained that Williamson was having issues with Barber and that he did this during work hours. *Id.* SA Rhame did not ask for additional details concerning the incident because she believed that Williamson's actions with Barber had nothing to do with Lawson or the criminal case that she was investigating. *Id.* at ¶6. SA Rhame orally reported these details, including reference to a TIGTA investigation, to the prosecutors assigned to the investigation in 2014. *Id.* at ¶8; *see* Hendrickson Dec. at ¶10.

At that time, the prosecutors had no facts to suggest that Williamson's actions impacted any IRS action related to Lawson. *See* Hendrickson Dec. ¶10. The prosecutors understood there had been a report to IRS management and/or a TIGTA investigation, and understood that this incident did not impact SA Rhame's criminal investigation. *Id.* The prosecutors had no basis to believe that the report to IRS management and/or TIGTA investigation was related in any way to the criminal investigation of Lawson. Accordingly, at that time, no further details were obtained. *Id.*

3.  <u>The disclosure of information regarding Williamson's conflict of interest</u>

It was only during trial preparation (for the then-scheduled January 2018 trial) that the prosecutors learned the "conflict of interest" was referenced in IRS records provided in discovery. *Id*. at ¶17. On October 6, 2017, Lawson's counsel sent the government a letter, seeking "[a]ny and all documents, material, memoranda, email, recording or other objects related to the conflict of interest that caused ROGM 44 to take over management of the investigation in place of ROGM 41." *Id*. at ¶15, Ex. 1. "ROGM 41" is an internal IRS designation for Williamson. Williamson's colleague, Hartford, was referred to as ROGM 44. Williamson Dec. at ¶1; Hartford Dec. at ¶2.[5]

On October 25, 2017, the government responded to Lawson's letter by stating that Lawson "appears to be requesting internal government documents excluded from discovery by Fed. R. Crim. P. 16(a)(2)." Hendrickson Dec. ¶16, Ex. 2. At that time, it was the government's understanding that the conflict of interest related to Williamson's personal relationship with Barber, because she was a tenant of Lawson. *Id*. at ¶18. The government further believed that the IRS appropriately made sure that Williamson was not involved with the IRS proceedings involving Lawson. *Id*. Accordingly, at that time, the government did not believe that the IRS's internal decision to assign a different collection manager could be exculpatory or otherwise relevant to the defense of Lawson. *Id*.

While Lawson continues to make unsupported claims the government has gone to great lengths, including misconduct, to prosecute him, it should be noted that the

---

[5] The government learned in October 2017 that another ROGM supervised RO Kimmel's collection of Lawson's taxes due to a conflict of interest. Hendrickson Dec. at ¶17. On May 16, 2018, the government learned that the IRS suspended Williamson for his actions. *Id*.

government has repeatedly endeavored to assist Lawson to understand the government's case and to easily locate specific records within the voluminous discovery. Hendrickson Dec. at ¶19. For example, the government produced all grand jury transcripts and memoranda of interview, even for witnesses that the government never intended to call at trial, including the grand jury transcripts of SA Rhame, to provide Lawson with a roadmap of its theory of the case. *Id*. at ¶20.

On November 3, 2017, Lawson filed his Second Motion for Discovery. Doc. 112. Lawson repeated the request that his counsel previously made by letter (*Id*. at 2) and stated that it was important for him to "to discern whether bias or other factors tainted the IRS' investigation of him" (*Id*. at 10). Lawson continued stating, "[g]iven the relatively small size of the IRS office in the Anchorage area, an acknowledged conflict of interest by an internal agent of the IRS is material to Dr. Lawson and potentially exculpatory." *Id*. Lawson did not support his claims of possible "bias" with any additional facts.

On November 17, 2017, the government opposed the Second Motion for Discovery, stating that documents concerning decision making regarding the assignment of IRS personnel are not discoverable under Fed R. Crim. P. 16 and that no documents should be disclosed pursuant to *Brady* or *Giglio*. Doc. 117 at 6. The government made this representation based on its understanding of the facts at that time. Hendrickson Dec. at ¶21.

On December 11, 2017 the Court issued an order, granting Lawson's motion, in part. Doc. 157. The court ordered the government to "review and produce all documents pertaining to the removal of ROGM 41 from Lawson's case due to a conflict of interest for material discoverable under Criminal Rule 16(a)(1)(A)-(D), (F) and (G), *Brady*, *Giglio* and

the Jencks Act." *Id*. at 8-9. The government searched for Jencks Act material and did not locate any documents. Hendrickson Dec. at ¶22. Williamson was never expected to be a trial witness, so the only potentially discoverable material would be exculpatory information required to be disclosed under *Brady*. *Id*. Based on the facts known to the government at that time, the government did not believe that *Brady* required the production of any documents because there was no evidence in the government's possession suggesting that anyone at the IRS had taken any improper action against Lawson during the collection proceedings, the civil examinations or the criminal investigation. *Id*.

On February 16, 2018, Lawson's counsel sent the government an email stating, in part, "I do not believe we received any documents pertaining to 'ROGM 41's removal from the investigation'" in response to the Court's order at Doc. 157. *Id*. at ¶23, Ex. 3. Shortly thereafter, the prosecutors provided a narrative explanation concerning the reason for Williamson's conflict of interest. *Id*. at ¶24.

On February 26, 2018, lead prosecutor Lori A. Hendrickson sent a draft letter of the narrative explanation to the prosecution team, including SA Rhame. SA Rhame responded with her comments stating:

> I feel like this more succinctly describes the activity and fully discloses the situation:
>
> During collection field operations in August 2011, Revenue Officer Manager John Williamson allegedly acted inappropriately towards the property of his ex-girlfriend, Tonya Naquin, who was staying in a hangar owned by Dr. Lawson. Because of the perceived interaction, Amber Martinez reported the activity to be further reviewed. Subsequent to the activity, Williamson was temporarily relieved of his management capacity over the Lawson case pending the review.

I am not sure if we need to go any further than that and am not sure if the defense would be entitled to the TIGTA report, but if you want to go down the road of telling the defense what happened, I would feel better fully disclosing the issue rather than only stating part of the facts in the letter.

*Id*. at ¶25, Ex. 4. The government finalized the letter and sent it to Lawson's counsel later that day. Def.'s Mot., Ex. K. The government explained that, regarding the conflict of interest, "there are no documents regarding that issue that are discoverable pursuant to Rule 16(a)(1)(A)-(D), (F), and (G), *Brady*, *Giglio* or *Jencks*. The government continued, stating:

> The IRS initially assigned Revenue Officer Amber (Martinez) Grey to collect Dr. Lawson's taxes in 2011. As part of her collection efforts, she served a levy for Dr. Lawson's wages on Midnight Sun Oncology at the office. She also visited other locations to determine what, if any, assets Dr. Lawson possessed for purposes of collection. As is common practice, her manager John Williamson accompanied her on those visits. When it was subsequently learned that Mr. Williamson had previously had a personal relationship with tenant Tonya Naquin, who was living at Dr. Lawson's hangar, the IRS reassigned future collection of Dr. Lawson's taxes to Revenue Officer Doris Marshal and Group Manager Doug Hartford.

*Id*. That explanation was based on the government's understanding of Williamson's conduct at that time. Hendrickson Dec. at ¶26.

As for the incident involving Williamson's entry into Barber's apartment, the government had no facts to suggest it was related to the IRS's collection proceedings or the civil examinations of Lawson. *Id*. at ¶27. The government understood that Williamson's actions did not influence the criminal investigation of Lawson in any way. *Id*.; Rhame Dec. at ¶¶9-10. Finally, since Williamson did not participate in the IRS collections proceedings prior to the civil examination, the government never considered calling him as a trial witness. Therefore, it was not concerned about gathering potential impeachment information as required by *Henthorn* or *Giglio*. Hendrickson Dec. at ¶27. For

those reasons, the government did not believe that it had an obligation to investigate and obtain additional facts concerning Williamson's misconduct. *Id.*

On March 21, 2018, Lawson's counsel articulated, for the first time, a more specific theory regarding IRS "bias" against Lawson. Lawson's counsel asserted:

> Dr. Lawson is entitled to discover evidence discussing the fact that an IRS agent had been in a romantic relationship with someone whom the IRS (wrongly) believed was later engaged in a romantic relationship with Dr. Lawson.

*Id.* at ¶28, Ex. 5. Lawson repeated this assertion in a footnote in his Motion for Compliance with Discovery Orders stating:

> The defense believes that the IRS agent in question [Williamson] and Tonya [Barber], Dr. Lawson's friend staying at the hangar, were at one point in a romantic relationship, that this relationship may have ended not too long before the investigation of Dr. Lawson, and that the IRS believed (wrongly) that Dr. Lawson and the IRS' agent's ex-girlfriend [Barber] were in a romantic relationship.

Doc. 202 at n.3. At that time, the government had no basis to believe such a claim. As such, the government responded by stating that it "does not understand the basis for this statement." Doc. 209 at 12-13.[6] The government further stated that any suggestion that "bias" against Lawson impacted the IRS's collection efforts was unsupported. *Id.* at 13.

On May 13, 2018, Lawson's counsel sent the prosecutors an email asking for documents related to a number of issues, including an August 2012 directive by FTA Kalanges to RA Zeznock to "suspend further case action until a related issue has been resolved." Def.'s Mot., Ex. M. On May 15, 2018, the prosecutors met with RA Zeznock to

---

[6] During the May 17, 2018 evidentiary hearing, the government told the Court that it had no knowledge of Lawson's claim regarding the government's supposed belief that he had a relationship with Barber. Hendrickson Dec. at ¶32, Ex. 6, May 17, 2018 Tr. at 94:17-21.

prepare him for his testimony regarding Lawson's Motion to Suppress Statements. Doc. 185; Hendrickson Dec. at ¶29. The government asked RA Zeznock if he recalled the reason for FTA Kalanges's directive. *Id*. He explained that the suspension was the result of a conflict of interest regarding Williamson. *Id*. He also explained that he heard about Williamson's misconduct around the time that he received the directive. *Id*. On May 15, 2018, the government responded to the email from Lawson's counsel stating, "The 'related issue' concerns the conflict of interest regarding ROGM 41. Pursuant to the Court's order at Doc. 157, there are no documents subject to discovery concerning ROGM 41." Def.'s Mot., Ex. M.

On May 16, 2018, the prosecutors met with RA Zeznock again and discussed the issue of the suspension of his civil examination of Lawson in greater detail. Hendrickson Dec. at ¶30. RA Zeznock again explained that the suspension was due to the conflict of interest. *Id*. However, he also explained his belief that the incident with Williamson occurred at the same time of the suspension in or around August 2012. *Id*. RA Zeznock asserted that RO Kimmel witnessed the incident and reported it to him the next day. *Id*. He also asserted that Williamson was suspended for his actions. *Id*. At that time, the prosecutors realized that RA Zeznock's recollection regarding these facts was not completely supported by the timeline established by IRS records: the entry concerning Williamson's conflict of interest first appears in IRS Collection records in August 2011 and FTA Kalanges's directive to RA Zeznock to suspend his activity occurred in August 2012. *Id*.

On May 17-18, 2018, the Court held an evidentiary hearing on Lawson's Motion to Suppress Statements. Doc. 219; Doc. 220. During the hearing, Lawson raised facts concerning the issue in this motion. *Id*. at ¶31, Ex. 6 at 68:17-22. Namely, the reason that RA Zeznock briefly suspended his civil examination of Lawson in August 2012 and the alleged misconduct by Williamson. *Id*. at 74:24-71:4. The Court repeatedly pressed Lawson's counsel to explain "the theory as to what impact this has on the case." *See id*. at 72:2-3; 73:23-74:1, 74:9-15, 75:1-5, 76:2-6, 76:13-14. The Court never received a direct answer. The following day, the Court noted its skepticism stating, "I do think this is in some ways a red herring on this issue. If anything, it goes to bias in a very tangential way." *Id*., Ex. 7 at 84:18-20. The Court further explained, "the Williamson thing is striking me as very much a red herring or a sideshow on this matter." *Id*. at 85:6-8. Nevertheless, the Court ordered the government to produce records related to the TIGTA investigation of Williamson for an *in camera* review. *Id*. at ¶33. The Court said that it would determine whether any of the records would be disclosed to the defense. *Id*. The Court tentatively scheduled a hearing for June 20, 2018. *Id*.

On May 30, 2018, Lawson filed his Motion re June 20 Hearing and for Additional Remedies. Doc. 230. He attached declarations by RO Kimmel and Barber as support for his speculation about IRS bias. Docs. 233 and 234 (refiled as Docs. 256 and 257 in support of Motion to Dismiss, Doc. 254).[7] Lawson filed this motion before the Court decided

---

[7] In preparation for the May 17, 2018 hearing, Lawson learned that former IRS employees, then FTA Kalanges, are required to get approval to testify at any court hearing related to their official actions as an IRS employee. The government provided Lawson with the memorandum authorizing the testimony of FTA Kalanges on May 15, 2018. As of the date of this filing, Lawson has not requested permission for RO Kimmel to testify at the evidentiary hearing scheduled to begin on August 6, 2018.

whether an evidentiary hearing would be held on June 20, 2018, and therefore, without the benefit of complete testimonial or documentary evidence concerning the issues raised. For that reason, on June 14, 2018, the government filed a short response opposing that motion, stating that it was "premature because the Court has yet to advise the parties of the results of the Court's in-camera review of IRS records, which, in part, would assist the Court in determining whether an evidentiary hearing will be held on June 20, 2018, and may determine the scope of that hearing." Doc. 248 at 2.

On June 15, 2018, the government interviewed Williamson for the first time. During the interview, Williamson stated that, while he dated Barber, she told him that she dated Lawson in the past and that she had taken trips with Lawson. Hendrickson Dec. at ¶34.

On June 20, 2018, the Court held a status conference in lieu of the evidentiary hearing. During the status conference, the Court stated that it would conduct an evidentiary hearing, which the Court later set for August 6-8, 2018. The Court also ordered Lawson to refile his Motion re June 20 Hearing and for Additional Remedies and ordered the government to provide a more fulsome response. On that day, Lawson refiled the motion as ordered, this time styling it as a Motion to Dismiss the Indictment. Doc. 254.

## LEGAL AUTHORITY

1. Dismissal of an indictment

"Dismissal of an indictment is warranted where outrageous law enforcement conduct violates due process." *United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004). Courts also have inherent authority to dismiss an indictment or fashion other remedies pursuant to their supervisory powers, which obligate them to protect the fair administration

of the criminal justice system. *Id.* "To justify exercise of the court's supervisory powers, prosecutorial misconduct must (1) be flagrant and (2) cause 'substantial prejudice' to the defendant." *Id.* at 1110 (citing *United States v. Barrera-Moreno*, 951 F.2d 1089, 1093 (9th Cir. 1991).

### 2. The *Brady* standard

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is obligated to produce to the defense any evidence favorable to the accused and material to his guilt or punishment. This includes "exculpatory information of which it is aware." *United States v. Flores*, 540 F.2d 432, 438 (9th Cir. 1976). It also includes impeachment evidence. *Strickler v. Greene*, 527 U.S. 263 281-82 (1999). A defendant's claim that evidence is material under *Brady* must not be speculative or based on a mere "hunch." *See Runningeagle v. Ryan*, 686 F.3d 758, 770-71 (9th Cir. 2012) (rejecting *Brady* claim "based only on speculation"); *United States v. Abonce-Barrera*, 257 F.3d 959, 969-70 (9th Cir. 2001) (defendant "offered nothing to support his proposed fishing expedition beyond what might have been useful"); *Flores*, 540 F.2d at 437 (A claim of materiality cannot be substantiated by a "hunch.").

"There are three components of a *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011).

## **ARGUMENT**

Lawson makes several arguments in support of his motion to dismiss the Second Superseding Indictment (the "Indictment"), all premised on "undisputed" facts that are

demonstrably false and hyperbolic. First, Lawson argues that the Court should dismiss the Indictment to punish "illegal conduct" or a "conspiracy by IRS agents (or prosecutors in this case, or both) to cover it up." Def.'s Mot. at 23. Next, Lawson argues that the Indictment should be dismissed as a sanction for "Egregious *Brady* Violations" based on his claims of "affirmatively misleading" statements and "obfuscation" by the government. *Id*. at 24-26. Lawson also requests an evidentiary hearing so that the Court can "determine the appropriate remedy in this case short of dismissal." *Id*. at 22. Finally, interwoven throughout Lawson's arguments are unsupported, conclusory and speculative claims that the IRS office in Anchorage was biased against him. *See* Def.'s Mot. at 2, 8, 14, 25.

Lawson points to no specific action taken by anyone at the IRS that resulted in any violation of his rights during collection proceedings, the civil examinations, or as the target of a criminal investigation. Lawson points to no evidence that should be suppressed based on any perceived bias and completely ignores the overwhelming evidence supporting the criminal charges. Since trial has not commenced, he has not been prejudiced.

1.  <u>There is no basis for the Court to dismiss the Indictment</u>

Lawson does not allege that he is the victim of a due process violation, as none has occurred, and no denial of due process occurs if *Brady* material is disclosed in time for its effective use at trial. Nonetheless, he calls on the Court to exercise its supervisory powers to dismiss the Indictment based on his claim that it is "undisputed" and "uncontested" that Williamson "burglarized Dr. Lawson's property . . . ." Def.'s Mot. at 22. Repeating his claim of "burglary," Lawson also accuses Williamson of "stalking" Barber. *Id* at 23.

Williamson attests to a much different version of the facts. During their on-again, off-again relationship, Barber gave Williamson the access code to Lawson's hangar and the keys to the hangar and to her apartment. Williamson Dec. at ¶6. On other occasions, Williamson entered the hangar to deliver things to her when she was not home. *Id*. at ¶¶7, 11. These visits occurred around the time of the April 4, 2012 incident. *Id*. Williamson has admitted that entering Barber's apartment without her knowledge while he was supposed to be working was a mistake. *Id*. at ¶10. However, his actions had no bearing on the civil examinations or criminal investigation of Lawson, and therefore, do not impact his ability to receive a fair trial. Williamson had been removed from supervising IRS collection efforts regarding Lawson more than one year earlier. *See id*. at ¶¶3-4; Harris Dec. at ¶2.

Next, Lawson puts forth his claim of a government conspiracy to cover up Williamson's misconduct. Def.'s Mot. at 23. He claims, "dismissal of the indictment is the only appropriate remedy for their cover-up of a crime." *Id*. at 24. First, dismissal of an indictment is not an appropriate remedy unless the government's alleged misconduct would make it impossible for Lawson to get a fair trial. *See Ross*, 372 F.3d at 1107. Second, no crime occurred. There was nothing for the IRS to "cover-up." Third, the prosecutors did not disclose Williamson's misconduct based on their good-faith belief that Lawson was not entitled to that information. Williamson did not participate in collection proceedings or the civil examinations and was not contacted as part of the criminal investigation. IRS collection activity began because Lawson filed his 2009 and 2010 individual income tax returns owing millions of dollars in unpaid taxes. Accordingly, Williamson's conduct did not appear to be exculpatory under *Brady* or material to Lawson's defense under Rule 16.

SA Rhame first heard about Williamson's misconduct when she spoke with RO Kimmel about Lawson's collection proceeding in 2013. Rhame Dec. at ¶¶4-5. SA Rhame relayed that information to the two prosecutors originally assigned to the case in 2014. *Id.* at ¶8. Based on the information known to the government at that time, the government had no reason to believe (and still does not believe) that Williamson had committed a crime or that his acts influenced the IRS's actions regarding Lawson. Instead, the prosecution team believed that Williamson's actions related to a personal matter between him and Barber and a personnel matter between him and the IRS. Hendrickson Dec. at ¶10.

Moreover, the prosecution team understood that Williamson had had no substantive or supervisory involvement in the IRS's civil collection and examination activities, or in the criminal investigation and subsequent prosecution of Lawson. *Id.* at ¶18. The government made representations to Lawson and the Court with those facts in mind. At no time did the government envision a scenario where the events surrounding Williamson's misconduct could be exculpatory or assist Lawson's defense in any way. *Id.*

Only on March 21, 2018 did Lawson's counsel assert the claim that Williamson "wrongly" believed that Barber had dated Lawson. *Id.*, Ex. 5. While unsubstantiated, this was the first occasion that Lawson articulated *any* basis for his claim of "bias." The government had no reason to believe that claim was true. The government did not confirm this claim until Williamson's interview on June 15, 2018. *Id.* at ¶ 34. Moreover, Lawson did not identify at that time – and has yet to identify – any impact of this alleged bias on any IRS proceeding involving Lawson. As Ninth Circuit case law makes clear, speculation

by a defendant does not trigger a *Brady* disclosure obligation. *Runningeagle*, 686 F.3d at 770-71; *Abonce-Barrera*, 257 F.3d at 969-70; *Flores*, 540 F.2d at 437.

It is undisputed that Williamson self-reported his potential conflict of interest immediately after the IRS assigned Lawson's collections case to his group in March 2011 and that thereafter he was affirmatively precluded from any involvement in the collections matter or any other IRS proceeding involving Lawson. Williamson Dec. at ¶¶4-5, 12; Harris Dec. at ¶¶2-3; Hartford Dec. at ¶4; Oen Dec at ¶¶6-7; Zeznock Dec. at ¶¶4-5; Kalanges Dec. at ¶4; Rhame Dec. at ¶¶9-10.

With the benefit of hindsight and a more complete record, the government acknowledges that, given the unique factual circumstances, it should have requested a Court order for Williamson's TIGTA and IRS personnel records and disclosed those to the Court for *in camera* review when Lawson first requested detailed information regarding this incident. This approach would have allowed the Court to determine what, if anything, should have been disclosed to Lawson, and may have avoided Lawson filing multiple motions based on unsupported speculation of government wrongdoing.

2.  <u>The government has not violated its *Brady* obligations</u>

Lawson's argument that the Court should dismiss the Indictment "to punish Egregious *Brady* Violations" is similarly groundless. According to Lawson, the *Brady* violations include the government's "affirmatively misleading" statements and "obfuscation" regarding Williamson's conflict of interest. Def.'s Mot. at 25, 26. As the government has explained, its representations were based on its understanding that

Williamson's actions had no relevance to Lawson's guilt or innocence, and could not be the basis for a claim of IRS bias or any other governmental misconduct.

Furthermore, during the August 6-8, 2018 hearing, Lawson will have the opportunity to explore his claim of IRS "bias" through cross-examination of at least seven witnesses who were involved in IRS proceedings concerning him or his entities. Lawson has suffered no prejudice to warrant the extreme remedy of dismissal of an indictment. As prejudice must ensue for there to be a *Brady* violation, and "substantial prejudice" must ensue to warrant dismissal of the Indictment, Lawson's motion must fail. *See Stinson*, 647 F.3d at 1208; *Barrera-Moreno*, 951 F.2d at 1093.

Lawson likens the facts here to those in *United States v. Chapman*, 254 F.3d 1073 (9th Cir. 2008). Def.'s Mot. at 26-27. In that case, *Brady* and *Giglio* violations were discovered after witnesses had already testified at trial. *Id*. at 1078-79. The district court found that the government acted "in bad faith" and that "the defendants would suffer prejudice if the case were retried." *Id*. at 1080. The facts here are nothing like those in *Chapman,* because the government has acted in good faith and trial has yet to begin.

3. The evidentiary hearing will establish that Lawson's claims of "bias" by the IRS are not supported by any facts

Lawson has repeatedly speculated that the IRS's Anchorage office could be biased against him. *See*, *e.g.*, Def.'s Mot. at 2, 8, 14, 25; Doc. 112 at 10; Doc. 273 at 8, 12. Additional investigation has revealed no evidence that Williamson or anyone else at the IRS was biased against Lawson, or that any action taken by the IRS during collection proceedings, the civil examinations, or the criminal investigar, was improper.

Williamson self-reported immediately after identifying the potential conflict of interest. He alerted Hartford and their supervisor Harris. Williamson Dec. at ¶4; Harris Dec. at ¶2. Harris agreed that Williamson had a conflict of interest and he was removed from any further involvement in Lawson's collections case. Williamson Dec. at ¶¶4-5; Hartford Dec. at ¶4. Similarly, Williamson played no role in the IRS Civil Examination proceedings involving Lawson, including the decision to refer Lawson to IRS-CI. Oen Dec. at ¶¶6-7; Zeznock Dec. at ¶¶4-5; Kalanges Dec. at ¶4. Further, there is no evidence that Williamson or any other IRS employee influenced SA Rhame's criminal investigation of Lawson. Rhame Dec. at ¶9-10.

## CONCLUSION

For the foregoing reasons, Lawson's Motion should be denied.

RESPECTFULLY SUBMITTED this 13th day of July, 2018, at Anchorage, Alaska.

> BRYAN SCHRODER
> United States Attorney
>
> s/ Lori A. Hendrickson
> LORI A. HENDRICKSON
> Trial Attorney
> U.S. Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2018 a true and correct copy of the foregoing was served electronically on the following:

Counsel of Record

s/ Lori A. Hendrickson
Trial Attorney